# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

HOWARD OWEN, )
 )
      Plaintiff, )
vs. ) NO. CIV-09-0557-HE
 )
CITY OF OKLAHOMA CITY )
POLICE DEPARTMENT, )
 )
      Defendant. )

## ORDER

Plaintiff Howard Owen filed this action against the City of Oklahoma City, asserting a retaliation claim under Title VII. He claims the City retaliated against him in various ways, leading to his eventual termination of employment, in response to his opposition to perceived race discrimination against a co-worker.[1] Defendant has moved for summary judgment on plaintiff's claim [Doc. #35], and the motion is now at issue.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The evidence and any reasonable inferences that might be drawn from it are construed in the light most favorable to plaintiff, the nonmoving party. Bd. of Educ. v. Pico, 457 U.S. 853, 863 (1982). Nonetheless, the party opposing the motion for summary judgment may not simply allege that there are disputed issues of fact. Rather, the party "must set forth *specific* facts showing the presence of a genuine issue of material fact for trial and *significant*

---

[1] *Plaintiff initially alleged he was terminated by the City. His amended complaint and other submissions make it clear plaintiff resigned. Plaintiff argues the resignation was forced by his financial circumstances, which were impacted by certain of the City's actions.*

*probative evidence* supporting the allegations." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 982 (10th Cir. 2002) (emphasis added) (citation omitted). Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact. L&M Enters., Inc. v. BEI Sensor & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000). Applying these standards to the submissions of the parties, the court concludes defendant's motion should be granted.

## **BACKGROUND**

There is no dispute as to the general circumstances out of which this case arose. Plaintiff began working as a police officer for Oklahoma City in 1984. By 2007-2008, he had reached the rank of lieutenant and was assigned to the School Resources Unit of the Operations Bureau. The School Resources Unit provided security for area schools.

In the Oklahoma City Police Department, lieutenants function as first line supervisors. Two were assigned to the School Resources Unit, plaintiff and Lt. Robert Mercer. The lieutenants report to and are supervised by a captain. At the times pertinent to this case, Brian Jennings was the captain assigned to the School Resources Unit and the person to whom plaintiff and Mercer reported. The lieutenants' jobs included, among other things, meeting with the principals of the schools assigned to them, working with the school system as to safety and security issues, and supervising the activities of the subordinate officers (typically sergeants) assigned to particular schools.

Two incidents are central to this case as the basis for the protected activity claimed by plaintiff. On December 21, 2007, plaintiff forwarded to Captain Jennings an email sent

2

to him by the Director of Athletics of the Oklahoma City school system. The email complained about the conduct of Sgt. Thomas Jaha, an officer assigned to one of the schools and supervised by Lt. Mercer, at a basketball game where Jaha acted as an assistant coach. Jennings instructed Mercer and plaintiff to investigate the situation. The investigation eventually concluded that Jaha was permissibly coaching on his own time and did not result in any action taken against Jaha.

The parties disagree on what the evidence shows about plaintiff's attitude and involvement as to the investigation of the December 21 incident. Defendant argues plaintiff never raised any objection to the investigation on the basis of race (Sgt. Jaha is an African-American), but did express concerns about Jaha possibly being paid by two employers simultaneously. Plaintiff denies having any concern about the dual role. Rather, he contends that Jennings had at one point said he would not allow Jaha to continue to coach, that he (plaintiff) objected to police department interference in the matter, that he viewed the investigation and Jennings' conduct as racially motivated, and that he so advised Jennings and Mercer. Jennings and Mercer deny there was any discussion of race.

The second incident occurred in 2008. On January 8, 2008, which plaintiff refers to as "1+8+08,"[2] Sgt. Jaha was involved in an incident regarding the detention of a female student for truancy. The girl's parents and some school administrators complained that Sgt.

---

[2]*For reasons not apparent to the court, plaintiff's brief repeatedly references dates in the following format: 01+08+08, 12+21+07, etc. The court is unaware of any style manual or accepted format which employs plus signs.*

Jaha had acted rudely toward the girl and other students and that he did not follow the proper procedures regarding truancy. Per Capt. Jennings' instructions, Lt. Mercer conducted an investigation into the incident. Jennings and Mercer also had a meeting with the parents and school personnel. The parents apparently elected not to pursue any formal complaint, but the investigation was completed. It concluded there were some issues as to Sgt. Jaha's demeanor, but concluded he had followed proper procedures as they were understood at the time.[3] Again, the dispute is as to plaintiff's role. He now asserts that he objected to the investigation of Jaha on the basis it was racially motivated and said so to Jennings and Mercer. Capt. Jennings and Lt. Mercer, however, claim that plaintiff never discussed race as a possible motivator for these investigations, but objected only to the investigation proceeding in the absence of a formal complaint from the parents or others.

There is no dispute as to certain matters which followed the two incidents. [Doc. #35, ¶¶ 21-34]. Two to three months later, in March 2008, an investigation was commenced into possible misconduct by an officer supervised by plaintiff. Evidence from that investigation eventually led to an investigation of possible misconduct by the plaintiff himself and others.[4] The investigation of plaintiff ultimately indicated that, between April 1, 2008, and May 5, 2008, plaintiff went home for lunch 9-10 times, failed to timely report for duty on eight

---

[3] *As a result of the investigation, the Police Department did change certain policies and rules regarding truant students. [Doc. #35-13; C001621-22].*

[4] *On March 28, 2008, the Chief of Police authorized the placement of a GPS device on the scout car assigned to plaintiff, to determine if he was visiting the schools assigned to him and his officer. [Doc. #35, ¶ 25]. On April 1, similar devices were placed on the cars of two other officers supervised by plaintiff. [Doc. #35, ¶ 26].*

4

occasions, received compensatory time for hours he did not earn on thirteen occasions, used his unmarked police car to travel to unauthorized locations seven times, and conducted personal business/errands on forty-two occasions during working hours.[5] On June 24, 2008, plaintiff was placed on paid administrative leave pending completion of the investigation by the Office of Professional Standards. On July 30, 2008, the head of the office recommended to the Chief of Police that the various allegations of misconduct be viewed as confirmed and various supervisors concurred.

On September 8, 2008, Chief Citty concurred with the recommendations to him and directed that a "Pre-Determination" hearing be held to allow plaintiff to respond to the allegations prior to any decision on discipline. On the same date, plaintiff filed his charge of discrimination with the EEOC. On September 17, 2008, plaintiff submitted his letter of resignation. On September 22, the City issued a notice of hearing to plaintiff.[6] On September 28, the City got notice of the EEOC filing. This suit followed.

## **DISCUSSION**

Title VII states, in part, that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any

---

[5]*Defendant asserts the investigation confirmed these facts and also asserts that, in the course of the internal investigation, plaintiff admitted the conduct. [Doc. #35, ¶ 35]. Plaintiff's brief denies the proffered fact, but offers absolutely nothing to support his bare denial. There is nothing in plaintiff's "statement of facts creating a controversy" which disputes the truth of the investigation's findings or the assertion that he admitted the truth of the findings.*

[6]*It is not clear whether, in light of plaintiff's resignation, the hearing was ultimately held.*

practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff claims he was discharged for opposing what he perceived as racial discrimination by his supervisor against a fellow officer who is African American.

Because plaintiff provides no direct evidence of improper retaliatory intent, his Title VII claim is analyzed under the McDonnell Douglas burden-shifting framework. To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action that a reasonable employee would have found material; and (3) there is a causal nexus between his opposition and employer's adverse action. McGowan v. City of Eufala, 472 F.3d 736, 741 (10th Cir. 2006). If plaintiff makes the necessary showing, defendant must then "show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006) (citing Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000)). If defendant does so, the burden then shifts back to the plaintiff to show defendant's offered reason is merely a pretext. Id. Here, defendant asserts plaintiff has failed to submit sufficient evidence to make out any of the elements of a prima facie case and that, even if the analysis progresses beyond the first stage, there is no basis for a finding of pretext.

The first element of a prima facie case—protected opposition by plaintiff—may be shown by evidence of an informal complaint to a superior regarding some activity protected

by Title VII. *See* <u>Hertz v. Luzenac Am, Inc.</u>, 370 F.3d 1014, 1015 (10th Cir. 2004).[7] It is not necessary for a plaintiff to show that actual discrimination took place. Rather, he need only show that "he had a reasonable good-faith belief that the opposed behavior was discriminatory." <u>Hertz v. Luzenac Am., Inc.</u>, 370 F.3d 1014, 1015-16 (10th Cir. 2004).

Plaintiff claims that he engaged in protected activity by objecting to Captain Jennings about his handling of both the coaching and truancy incidents. There is evidence that plaintiff objected to the investigations of Sgt. Jaha. However, his evidentiary submissions fail to show that he objected to the handling of either incident on the basis of race. *See* <u>Zokari v. Gates</u>, 561 F.3d 1076, 1081 (10th Cir. 2009) ("The employer must know not only that the employee has opposed an action of the employer . . . but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII.") With respect to the coaching incident, plaintiff's deposition testimony was as follows:

> And so Capt. Jennings and I got into kind of a heated argument over whether or not Jaha – well, he said Jaha won't coach basketball and I told him, I said "Well, I don't believe we can tell officers that they can and can't do for an extra job," and I believe I specifically said that if Classen [the school where Jaha was coaching] wants to pay Jaha to mow the yard, they can do that and that this did not fall under our security for Campus Resources.

Owen's Depo. [Doc. #41-1, p. 65, ln. 1-8]. He later characterized that conversation as follows: ". . . I told him [Jennings] that that was not right; you can't do that. That's, you know, discriminating and it doesn't look right . . . ." Owen's Depo. [Doc. #41-1, p. 78, ln.

---

[7]*It is undisputed that the Police Department had formal procedures for the reporting of complaints of racial discrimination and that plaintiff did not use those procedures. [Doc. #35, ¶¶ 3-6].*

7

17-19]. However, there is no indication that plaintiff ever explicitly voiced any objection to Jennings on the basis of race.[8] The only evidence cited by plaintiff which does reference race relates to his conversations with Mercer—in this context a co-worker rather than a supervisor—to the effect that he told Mercer that he thought Jennings actions were racially motivated. It is questionable whether comments to a co-worker can, in and of themselves, constitute protected activity in this context,[9] but, in any event, it is comments to Jennings which plaintiff asserts as the basis for his claim. Here, there is no evidence that, in connection with the "coaching" incident, plaintiff ever objected to Jennings or any other superior about conduct prohibited by Title VII.

Similarly, there is no evidence that plaintiff objected to Jennings' handling of the "truancy" incident on the basis of racial motivation or discrimination. Rather, plaintiff's evidence suggests nothing more than that he objected to pursuing an investigation of Jaha's conduct after it developed that the offended parents would not be filing a formal complaint. Owens Depo. [Doc. #41-1, p. 69, ln. 14-18 (plaintiff tells Jennings "I don't agree with this because there is nothing there. If they don't want to complain, you can't force somebody . . .")]. There is evidence to the effect that Mercer, in conversations with plaintiff, said (and

---

[8]*There is deposition testimony to the effect that plaintiff thinks Jennings actions were racially motivated. But the question is not whether plaintiff now thinks that or whether he thought it at the time. The question is whether he expressed that concern to his employer, through Jennings or some other supervisor, so as to constitute protected activity.*

[9]*See* Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008), quoting* Hertz v. Luzenac*, "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." 370 F.3d at 1015 (emphasis added).*

8

plaintiff agreed) the only basis for any complaint by the parents and/or school officials was that Jaha was a "large black man." But the question is not whether there was an appropriate basis for any complaints, formal or otherwise, by the parents or school officials. The question is whether there is evidence of protected activity by plaintiff, i.e. objection on the basis of race to the investigation of Jaha. Plaintiff's evidence falls short of that.

The result is that plaintiff's evidence is insufficient to show actions by him, arising out of either incident, which constituted objection to conduct addressed by Title VII. He has not satisfied the first element of his prima facie showing.

It is questionable whether plaintiff has made a sufficient showing of the second element—an adverse action that a reasonable employee would have found material. At least insofar as the extraordinarily spare discussion of the issue in his brief is concerned, plaintiff explicitly relies only on the fact of his suspension for an indefinite duration as evidence of adverse action.[10]

In determining whether an adverse action has occurred, the question is whether the employer's actions are such that they would "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). The "significance of a given act of retaliation will often depend upon the particular circumstances. Context matters." Id. at 69.

Here, it is undisputed that the suspension upon which plaintiff relies was a suspension

---

[10]Plaintiff's brief includes no citation of authority on any aspect of the adverse action issue.

with pay. The Tenth Circuit has concluded that, in at least some circumstances, a suspension with pay does not constitute adverse action. Juarez v. Utah, 263 Fed. Appx. 726, 737 (10th Cir. 2008) (unpublished) (affirming a district court determination that placing a plaintiff on paid administrative leave pending completion of a sexual harassment investigation would not constitute a material adverse action to a reasonable employee). This is consistent with the positions of several other circuits. *See* Whitaker v. San Jon Sch., No. CIV-04-1237, 2006 WL 1308234, at *6 (D.N.M. Apr. 19, 2006) (citing circuit cases concluding that placing an employee on administrative leave with pay pending an investigation is not an adverse employment act). However, given the context specific nature of the determination, coupled with plaintiff's evidence that his suspension prevented him from earning money from extra-duty assignments during the suspension, the court concludes that, while the question is close, plaintiff has offered evidence sufficient to make out the necessary prima facie showing of adverse action.

Plaintiff has not, however, produced evidence sufficient to make out the third element—a showing of a causal connection between his protected activity and his suspension. "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" O'Neal v. Ferguson Constr. Co. 237 F.3d 1248, 1253 (10th Cir. 2001) (quoting Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982)). Here, six to seven months passed between the alleged protected conduct and plaintiff being placed on

administrative leave.[11] Given the length of time elapsed, plaintiff's reliance on temporal proximity, without more, is an insufficient basis for creating an issue as to a causal connection. *See* MacKenzie v. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005) (noting that "a three month period, standing alone, is insufficient" to establish a causal connection). The only additional evidence plaintiff points to as showing the necessary connection is disciplinary records allegedly showing disparate treatment of other officers in similar circumstances[12] and Captain Jennings' failure to report plaintiff's complaints to higher authorities in the department. Captain Jennings' failure to report the complaints makes no difference here, given that, as discussed above, there is insufficient evidence that plaintiff's complaints were on the basis of race or other prohibited basis.

Whether evaluated from the perspective of establishing the causal connection requirement of plaintiff's prima facie case or of determining whether evidence of pretext exists, plaintiff's reliance on the alleged differential treatment of other officers in other disciplinary situations is unpersuasive. Proof that other similarly situated persons were treated differently than plaintiff may, of course, be probative in a proper case. But the other persons must in fact be similarly situated. Here, the persons to whom plaintiff points are not.

Plaintiff claims an officer (DW) drove his car to his home on multiple occasions, but

---

[11]*While a suggestion of some shorter period might be arguable in the circumstances existing here, based on the commencement of the investigation, plaintiff's brief explicitly agrees that a 6-7 month time period is the pertinent frame of reference.*

[12]*Plaintiff's discussion of disparate treatment of other officers is perhaps more appropriately considered as evidence of pretext—the third step issue on which plaintiff's brief is largely silent. However, as plaintiff suggests it is evidence of causal connection, the matter is addressed here.*

was only counseled. However, the proffered proof (plaintiff's deposition testimony) does not really address what DW is alleged to have done, Owens Depo. [Doc. #41-1, pp. 30-31], other than to suggest that DW did "all of these allegations in one day . . . ." Owens Depo. [Doc. #41-1, p. 123, ln. 5-6]. Plaintiff's misconduct was very different in scope, reflecting repeated instances of misconduct over several weeks. And unlike plaintiff, DW was not a supervisor. Similarly, the conduct of the only other supervisor identified by plaintiff (KW), which resulted in counseling, involved a single incident of using an official vehicle and work time for personal business, not the extensive course of misconduct committed by plaintiff. Plaintiff points to another officer (TH) receiving a Class I reprimand for a single incident of improper use of city vehicle and related conduct, a circumstance different from that involving plaintiff.[13] A different officer (JL) was involved in repeated misuse of a city vehicle over several months, but he received a Class III reprimand and a one-day suspension without pay—a circumstance wholly different from plaintiff who had not, as of the time of his resignation, been formally disciplined at all.

This latter aspect—that plaintiff had not been disciplined at all—is an obvious difference between plaintiff's circumstances and those of all the other officers whose disciplinary records he relies on. Apart from whatever indirect impact plaintiff's suspension may have had on his ability to take extra-duty assignments, it is clear that he had not been disciplined and that the Police Department was still in the process of determining, as of the

---

[13]*An additional instance of an officer (CH) parking his "take home" city vehicle at his girlfriend's house, rather than his own home, resulted in counseling and further training.*

time of his resignation, whether and what discipline would be appropriate as to plaintiff. However, the most obvious difference between plaintiff's circumstances and those of the other officers is that plaintiff's underlying misconduct was far more extensive than any of theirs. In sum, the other officers were not similarly situated with plaintiff and their treatment by the Police Department supports no inferences that are helpful to plaintiff.

The result is that plaintiff's submissions are insufficient to establish at least two required elements of his prima facie case—the fact of protected conduct and the existence of a causal connection between the claimed conduct and the alleged retaliatory action. In light of this determination, it is unnecessary to consider the remaining steps of the McDonnell Douglas inquiry. However, even if a prima facie case be assumed, the defendant has identified a legitimate reason for any adverse action found to have been taken. Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1123 (10th Cir. 2007). And, for the reasons indicated in the above discussion of the disciplinary treatment and otherwise,[14] plaintiff has produced no evidence that would support a finding of pretext. The evidence is undisputed that he committed significant misconduct over an extended period. The evidence is undisputed that the investigation of plaintiff resulted from inquiries directed toward others. Plaintiff offers neither evidence nor argument controverting defendant's assertion that Chief Citty was the only person with the authority to commence the internal investigation and that he knew nothing of plaintiff's purported complaints of racially discriminatory treatment of

---

[14]*As noted previously, plaintiff's brief includes no explicit discussion of the issue of pretext.*

Sgt. Jaha. In short, there is no evidence which would support an inference of pretext even if the McDonnell Douglas analysis were to progress to that point.

## CONCLUSION

For the reasons stated, the court concludes plaintiff has failed to produce evidence sufficient to raise genuine issues of material fact as to the indicated essential elements of his retaliation claim. Defendant is therefore entitled to judgment as a matter of law. The City's motion for summary judgment [Doc. #35] is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 22nd day of December, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE